## COMMONWEALTH vs. WALENTY Z. GIL.

Norfolk. April 2, 1984. — November 6, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Homicide. Evidence,* Admissions and confessions, Relevancy and materiality, Of motive, Hearsay, Threats, Impeachment of credibility. *Witness,* Impeachment. *Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Instructions to jury, Capital case.

At the hearing on a motion to suppress evidence in a murder case, the judge was warranted in concluding that questioning of the defendant at a police station several hours after police had begun investigating the homicide of the defendant's estranged wife and her boyfriend was noncustodial until a police officer discovered that the pattern on the soles of the defendant's shoes matched a set of footprints found at the murder scene, and that before this time the police officers were not required to give the defendant Miranda warnings. [210-214]

At the hearing on a motion to suppress evidence in a murder case, there was sufficient evidence that the Polish-speaking defendant understood Miranda warnings given in English by police officers, and that the defendant had voluntarily and knowingly waived his rights. [214-215]

At the trial of a defendant charged with the murder of his estranged wife and her boyfriend, the judge did not abuse his discretion in admitting in evidence court orders, issued some seven months before the murders, prohibiting the defendant from communicating with his wife or son, and requiring him to vacate the marital home, as well as certain evidence that the defendant had physically abused his wife some years earlier. [215-217]

At the trial of a defendant charged with the murder of his estranged wife and her boyfriend, admission of hearsay evidence that the defendant had threatened to kill his wife if she left him did not amount to prejudicial error in view of other evidence respecting the hostility between the defendant and his wife, and in view of the compelling circumstantial evidence of the defendant's guilt. [217-219]

At a murder trial during which the defendant's sister testified that she had not seen the defendant either on the evening in question or the following morning, the judge did not err in permitting a police officer to testify that when he had interviewed the sister she had stated that on the evening in question she had seen the defendant asleep in her mother's apartment. [219-220]

Failure by the judge in a murder case to instruct the jury on alcohol intoxica-
   tion as a mitigating factor in the crimes charged did not provide a basis
   for this court's exercise of its powers under G. L. c. 278, § 33E, in a
   case where alibi, not intoxication, was the defense, and where there was
   no evidence of intoxication at the time of the crimes sufficient to raise
   the issue. [220-221]
In the circumstances, the coincidental similarity of the "footprints in the
   snow" example used by the judge in a murder case in instructing the
   jury and evidence of bloody footprints on the floor at the scene of the
   crime was not likely to make the jurors believe that the judge was
   expressing his belief in the Commonwealth's theory of the case. [221-222]

INDICTMENTS found and returned in the Superior Court De-
partment on August 23, 1982.

A motion to suppress evidence was heard by *Roger J.
Donahue*, J., and the cases were tried before him.

*Steven J. Rappaport* for the defendant.

*Peter W. Agnes, Jr.*, Assistant District Attorney, for the
Commonwealth.

LIACOS, J. On August 23, 1982, a Norfolk County grand
jury returned indictments charging Walenty Z. Gil (Gil) with
the murder in the first degree of his wife, Maria A. Gil, and
of Frank Doherty. Following trial, the jury returned a guilty
verdict on each indictment. The defendant was sentenced to
two concurrent terms of life imprisonment at the Massachusetts
Correctional Institution at Walpole. He appeals.

The defendant claims that the judge erred in ruling that he
had waived his Miranda rights and in refusing to suppress
statements made and evidence seized. The defendant also pre-
sents numerous allegations of error concerning improperly ad-
mitted evidence, omitted jury instructions, and improper por-
tions of the charge. We affirm.

We summarize the evidence. Gil, a native of Poland and a
naturalized citizen, had been married to Maria Gil for approx-
imately twenty years. They separated in January, 1982. Gil
and Maria jointly owned and operated a business in Norwood
called Dundulis Lunch, Inc. (Dundulis). Prior to their separa-
tion, the couple and their son John resided in an apartment
above Dundulis. In January, 1982, Maria obtained a court order

restraining Gil from communicating with Maria or John in any way and requiring Gil to vacate the marital home. Maria and John continued to occupy the apartment. In June, 1982, Maria's boy friend, Frank Doherty, moved in with them.

On the evening of August 15, 1982, Gil was at the Polish club in South Boston. He had driven there in his red Ford pick-up truck. Gil was seen leaving the club at approximately 11 P.M. Witnesses for the Commonwealth testified that a red pick-up truck with a white cab, similar to the truck operated by Gil, was seen in the vicinity of Dundulis. The truck was observed by these witnesses at 11:50 P.M. on August 15 and at 12:45 A.M. on August 16.

On August 15, a patron of Dundulis arrived at the bar at 11:30 P.M. Maria, Doherty, and the patron were the only persons in the bar. The patron left at about 1:30 A.M., and he heard Maria lock the door behind him. At approximately 6 A.M. on August 16, John Kotak, the man who regularly cleaned the premises at Dundulis, arrived. When he entered, he found Maria's body slumped over boxes at the far end of the bar, and Doherty's body lying at the bottom of the stairway leading to the upstairs apartments. The bodies showed several stab wounds, especially around the chest area.[1] There were large amounts of blood underneath the bodies and dried blood in the hallway and kitchen areas.

The officers who responded to the scene observed two sets of footprints in the kitchen area. One set appeared to be made by an unshod foot, the other was an impression made by a shoe sole which had a distinctive rippled "V" pattern. Sections of the kitchen floor which bore the shoe prints were removed and later introduced as evidence at trial. Following a complete search of the premises,[2] the officers secured the crime scene and left the premises.

---

[1] The medical examiner who investigated the homicides determined that the deaths resulted from repeated stabbings.

[2] The officers searched the cash register, which was closed with the key in the lock, and found about $58. The officers also made an unsuccessful search for a weapon that could have been used in the killings.

Early in the afternoon on August 16, Gil arrived at George's Place, a bar which was across the street from Dundulis. He met a friend, Gerard Kane, who asked him if he had heard what had happened. Gil said that he had been informed earlier that morning by someone at the Polish club. Kane testified that Gil appeared upset. Kane told Gil that the police wanted to talk with him. The two men went across the street to Dundulis, where Officer John Riley was guarding the scene. When the men asked about the homicides, Riley instructed them to go to the police station and to talk with Detective William C. Casey.

Kane drove Gil to the Norwood police station, where Gil was informed of the homicides by Detective Casey and State Trooper Joseph L. Brooks. Gil said that he wanted to cooperate fully in the investigation. Subsequently, Gil provided the officers with personal background information. When he was asked if he knew anyone who might want to kill his wife, after some hesitation he named Charles Moseley, a man who had had a relationship with Maria from 1977 until 1980.

During their conversation, Brooks noticed that the rippled "V" pattern on the sole of Gil's black shoes bore a strong resemblance to the impression found in the blood at Dundulis.[3] At that point, Brooks advised Gil of his Miranda rights. Subsequently, his shoes and truck were seized and were subjected to chemical analyses. Gil also provided the police with a blood sample.

The police obtained a warrant to search the apartment where Gil resided with his mother and brother. From a bedroom near the kitchen area, an officer seized a blue nylon jacket with Gil's nickname, Val, printed on the sleeve. The jacket had blood stains on the sleeves and on other portions of the garment. The officers also seized Gil's key rings. One key fit the lock on the side door of Dundulis. This door was locked on August 16 when police inspected the scene.

---

[3] Brooks identified the shoes which Gil wore at the police station. They were introduced in evidence.

The pathologist who performed the autopsies testified that Doherty's blood type was group A; Maria's blood type was group O. Gil's blood sample indicated that his blood type was group A. Samples of blood obtained from the kitchen floor at Dundulis were also found to be group A blood. Two forensic chemists who performed extensive tests on the materials seized from Gil and from the crime scene testified as to their conclusions. Chemist Ronald Kaufman found traces of blood on the steering wheel, gas and brake pedals, and on the driver's-side floor of Gil's truck. Tests performed on Gil's jacket revealed the stains as human blood group O and group A. Tests performed on Gil's shoes revealed that the stains on the tops of the footwear were group A human blood. Kaufman also observed blood on the rippled soles of both shoes. This blood could not be grouped chemically. Kaufman admitted that it was impossible for him to determine whether any of the group A blood came from Gil or from Doherty.

Kaufman also testified that he inserted Gil's right shoe into the preserved sole impression taken from Dundulis. The shoe fit the imprint, indicating that it was the same size. Kaufman repeated this procedure at trial before the jury. Kaufman concluded that the shoe and imprint were consistent in size and pattern.

Another forensic chemist, John Abbott, conducted enzyme and protein tests on blood samples from Gil and Doherty. These tests revealed that their blood, although both group A, was distinguishable by the presence of different enzymes and proteins. Thus, the chemist was able to determine whether blood from Gil's clothing and shoes came from Gil or, alternatively, whether it was consistent with the blood of Doherty or Maria, and could not have come from Gil. Abbott testified that blood stains on Gil's shoe were of a blood type consistent with Doherty's blood but were inconsistent with both Gil's blood and Maria's blood. Abbott stated that the statistical occurrence of Doherty's blood type among Caucasians was only one in 192 Caucasians. Similar analyses of the blood on Gil's jacket showed that some of the stains could have come from Maria, but not from Doherty or Gil. Abbott concluded that other

blood stains on the jacket could not have been derived from Gil, but could have come from Doherty.

Charles Moseley had been a friend of Maria and Gil for ten years. In 1977, while Gil was still living with Maria, Moseley commenced an intimate relationship with her. Moseley testified that, on more than five occasions during 1977 and 1978, he observed Gil physically abuse his wife at Dundulis and at Gil's mother-in-law's house. Usually, Gil was intoxicated when he inflicted these beatings. Moseley recalled asking Maria, on Christmas day in 1975, why she never divorced Gil. Moseley testified that Maria said that once she tried to leave Gil, and he threatened to kill her if she ever tried it again. Moseley also testified that, after 1980, when they had terminated their relationship, he and Maria remained friends.

Defense counsel presented evidence to show that Moseley was seen at Dundulis on August 15. A patron of Dundulis testified that he saw Moseley come to the bar at approximately 1:30 P.M. on August 15. The patron testified that Maria asked Moseley to leave, and it appears that Moseley left the premises. The patron also testified that, since Doherty and Maria had been living together, "it was a tense situation" whenever Moseley came to the bar. The patron said that Moseley had been asked to leave on other occasions. Another patron, who had managed Dundulis for Gil as a part-time job, testified that he saw Moseley drive by Dundulis about noontime on August 15 and then again at approximately 6:30 P.M. The patron did not come forward with this information until a week before the trial. He testified that he had never spoken with any police officers about his observations. The patron also admitted that he had had eight drinks after Dundulis opened that day.[4]

_____

[4] The police had investigated Moseley as a possible suspect but found no substantial evidence to link him with the crimes. Moseley testified that at 11:30 P.M. on August 15 he went to a bar after work and then home to his motel. On August 16, he said, he awoke, went out for coffee, and then returned to the motel before work. Moseley's supervisor and project engineer in charge of maintaining the work records testified that Moseley worked from 3:30 P.M. to 11 P.M. on August 15 and 16, 1982.

The defense also presented evidence to show that Gil was not at the scene of the crime when the homicides were committed. His mother, Mrs. Josepha Gil, testified that Gil came home at about 12:15 A.M. on August 16. She said Gil took medication for a physical condition and then went to sleep. She also testified that Gil did not leave the house that night and that he arose the next morning at approximately 7 A.M.[5] Sabrina Gil, Gil's sister, lived in an apartment one floor above her mother's residence. She testified that she had come home at about 10 P.M. on August 15 but had not seen her brother or observed his truck either that evening or the following morning when she left for work.

George Gil, the defendant's brother, was living with his mother and the defendant on August 15. He testified that he had come home at about 6:45 A.M. before work on August 16 and had seen Gil lying on the living room sofa. On cross-examination, George denied telling Trooper Brooks a different version of his whereabouts on the morning of August 16.

Brooks testified, on rebuttal, that George Gil and he had conversed on August 16 at about 11:55 P.M. outside the Polish club. Brooks stated that George told him that he had slept at his girl friend's house on August 15, and on August 16 he proceeded directly to work from her home. He also said that he had not returned to his residence in South Boston, nor had he seen his brother that day.

1. *The suppression issues.* Gil arrived at the police station at 2 P.M. on August 16. Trooper Brooks and Detective Casey (officers) told him that his wife had died  Gil told the officers that he had learned of his wife's death that morning from some acquaintances at the Polish club. The officers interrogated Gil for about two hours. At approximately 4 P.M., Brooks noticed that the sole of Gil's shoe had a rippled pattern which bore a strong resemblance to the shoe print found in the blood at Dundulis. After making his observation known to Casey, Brooks informed Gil of his Miranda rights. Subsequently, the

---

[5] Gil gave a similar account of his whereabouts to Trooper Brooks during their initial interview.

officers asked Gil if he would allow them to search his truck, and he consented. Gil signed a consent form which stated, in relevant part, that the signer was informed of his right not to have the search made.

Gil was present while the search and chemical analysis on the truck were conducted. During this time, Brooks observed red-brown stains on the top and sides of Gil's shoes. Brooks asked Gil if he would give them his shoes for testing, and he agreed. Gil signed another consent form indicating that he had been informed of his right not to have a search made. The officers also asked for, and obtained, a signed consent form from Gil allowing the police chemically to test his hands for traces of blood. Then Casey transported Gil from the station to a funeral home. Later, the officers obtained a warrant to search Gil's residence. As a result of this search, the police seized Gil's blood-stained jacket and his key rings. The following day, Gil came to the police station requesting the return of his truck. At that time, Gil agreed to provide a saliva sample and a blood test, and he again signed an identical consent form.

Gil contends that the judge committed reversible error in denying his motion to suppress and in ruling that the defendant had voluntarily and knowingly waived his Miranda rights orally and by signing the consent forms.[6] See *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). Gil first claims that he was subjected to custodial interrogation from the time that he arrived at the police station and commenced answering the officers' questions. He contends that the Miranda warnings should have been given to him before the interview began. Gil also argues that he did not understand the Miranda warnings, which were given to him in English, and thus he proceeded to make statements and sign consent forms without a knowing and intelligent waiver of his Fifth Amendment rights.

In reviewing the correctness of a judge's ruling on a motion to suppress evidence, we are not likely to disturb the judge's

---

[6] On appeal, the defendant does not contest the correctness of the judge's ruling that, based on Gil's signing of police consent forms, the evidence was lawfully seized pursuant to the Fourth Amendment. Accordingly, we need not address that issue.

findings of subsidiary facts when they are warranted by the evidence. *Commonwealth* v. *Garcia*, 379 Mass. 422, 429 (1980). The Commonwealth cannot use statements or other evidence, whether inculpatory or exculpatory, attained from a custodial interrogation when the defendant has not been informed of Miranda rights. Custodial interrogation has been commonly defined as questioning by law enforcement officers of a defendant who "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra.* In *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984), we detailed several pertinent factors which have proved helpful in answering the question whether an interrogation is custodial: "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest."

Although we recognize that "an interview at [a police station or at another] official place intimates a degree of coercion, see *Commonwealth* v. *Haas*, 373 Mass. 545, 552 (1977), it does not, in itself, brand an interrogation as custodial." *Commonwealth* v. *Bookman*, 386 Mass. 657, 660 (1982). A defendant's voluntary appearance at the police station is one factor suggesting that the interview is noncustodial. See *Commonwealth* v. *Best*, 381 Mass. 472, 494 (1980); *Commonwealth* v. *Simpson*, 370 Mass. 119, 125 (1976). Further indicative of a noncustodial interview is evidence showing that the defendant was not a suspect at the time of the questioning and that the atmosphere in the interview was informal or devoid of any attempt to compel statements from the defendant. Also intimating that an interview is noncustodial is evidence that the defendant believed that he was free to leave the questioning session at any time, and that he actually did leave at the termination of the interview. Cf. *Commonwealth* v. *Bryant, supra* at 737-738.

At the suppression hearing, Detective Casey and Trooper Brooks testified that Gil appeared at the police station voluntarily on August 16. The officers testified that Gil said that he had come to the station because he wanted to help the police find the person who had killed Maria. Gil admitted telling the officers that he wanted to assist in the investigation. The evidence warranted the judge's finding that Gil voluntarily appeared at the police station.

The investigation into the double homicide had commenced only several hours before Gil arrived at the police station. The officers testified that, when Gil arrived at the station, they did not yet have a suspect in mind.[7] As part of ordinary police procedure, they wanted to find Gil immediately, to inform him of his spouse's death, and to discern whether Gil had any information which could assist them in the investigation. Gil was interviewed by Detective Casey, whom he had known for approximately fifteen years.

The evidence demonstrates that the police investigation had not focused on Gil as a suspect. The investigation had only begun, and there was no evidence known to the officers prior to the observation of the soles of his shoes which linked Gil with the homicides. Gil had an alibi that appeared credible. The testimony of the officers also demonstrated that the atmosphere during the interview was informal and noncoercive, at least until Brooks noticed Gil's shoes. During the questioning, Gil could move freely around the office and was told that he could use the telephones at any time. There was never any mention of arrest. Gil was free to leave at any time during the interview before the officers observed his shoes.

Thus, after applying all the *Bryant* factors to the evidence presented at the suppression hearing, we conclude that the defendant reasonably could not have perceived the interrogation as coercive in nature. The defendant was not entitled to receive

---

[7] Before Gil arrived at the station, the police officers had received information from Gil's mother which tended to eliminate him as a suspect.

Miranda warnings prior to the time when the officers noticed his shoes.[8]

We now turn to determining the correctness of the judge's finding that Gil made a voluntary, knowing, intelligent waiver of his Miranda rights. Although a finding by the trial judge of a voluntary waiver is entitled to substantial deference by this court, *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978), we also "'indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Id.* at 137, quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938). The crucial question here is whether the Commonwealth sustained its burden of proving that Gil truly understood the import of each Miranda warning and then voluntarily waived his right to remain silent. See *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966); *Commonwealth* v. *Garcia*, 379 Mass. 422, 429 (1980).

At the suppression hearing Gil claimed lack of sufficient fluency in English to understand and to waive his rights. The Commonwealth presented several witnesses who testified that Gil could converse in English with some fluency. Moreover, one of the Commonwealth's witnesses knew from personal knowledge that Gil, when previously arrested, had been given Miranda warnings and had acknowledged comprehending these rights. There was also evidence that Gil had experience with legal procedures since he had appeared as a defendant in criminal cases in courts in Quincy, South Boston, Dorchester, Norfolk County, and the State of Maine. Trooper Brooks testified that he could understand Gil well and perceived that Gil also comprehended him because Gil's answers were always responsive to the officer's questions. There was additional evidence

---

[8] The judge did not make a specific finding that there was no custodial interrogation prior to the moment when the officer apprised Gil of his Miranda rights. In view of the cogent evidence presented at the hearing and the judge's findings that the defendant's appearance and conduct at the station was voluntary and was not the result of coercion, we conclude that the interview was not a custodial interrogation up to the time the Miranda warnings were given. We note also that Gil was not arrested at this interview and was allowed to leave.

that Gil comprehended the English language and the situation in which he found himself, including testimony of an assistant district attorney who testified that, when the affidavit for the search warrant was being prepared, he met with Gil to confirm that he had been advised of his Miranda rights. The assistant district attorney conversed with Gil with no difficulty. The evidence presented by the defense only served to sustain the Commonwealth's burden of demonstrating that Gil intelligently waived his Miranda rights. Additionally, Gil's testimony at the suppression hearing lent credence to the judge's ultimate conclusion that the defendant comprehended the Miranda rights.

The judge found that Gil had "no serious language difficulty" and had the ability intelligently to waive his Miranda rights. The judge also found that Casey and Brooks gave a "credible" and "accurate" account of the events which ensued at the police station, and determined that Gil comprehended his rights. The judge concluded that, beyond a reasonable doubt, Gil voluntarily and knowingly waived his Miranda rights. These findings are supported amply by the evidence. There was no error.

2. *The restraining orders.* The defendant objected to the admission in evidence of the court orders issued against Gil in January, 1982, pursuant to G. L. c. 209A, prohibiting him from communicating with Maria or John Gil, and requiring him to vacate the marital home. The trial judge ruled that this evidence was admissible as probative of the status of the Gils' marital relationship, and was potentially relevant to Gil's motive to murder. The defendant argues that the admission of this evidence was prejudicial error, since the January, 1982, orders were too remote in time from Maria's death.[9]

Evidence of a hostile relationship between a defendant and his spouse may be admitted as relevant to the defendant's motive to kill the victim spouse. See *Commonwealth* v. *Burke*, 339 Mass. 521, 533 (1959). A restraining order which issues to protect the victim spouse from physical abuse by the defendant spouse may also be admissible to show the status of the marital

---

[9] The defendant does not argue that the orders were inadmissible hearsay.

relationship and a motive to murder by the defendant. See *Commonwealth* v. *Martin*, 357 Mass. 190, 192 (1970). Cf. *Commonwealth* v. *Gilbert*, 366 Mass. 18, 28 (1974). Although the decision is left largely within the discretion of the trial judge, such evidence should not be admitted if it relates to events which occurred at a time too remote from the killing. See, e.g., *Commonwealth* v. *Abbott*, 130 Mass. 472, 475 (1881) (animosity between husband and wife three years before wife's murder too distant to be probative of husband's motive); *Commonwealth* v. *Burke, supra* at 534 (evidence of defendant husband's adulterous relationship which terminated seven months before wife's death not probative of motive to murder). But cf. *Commonwealth* v. *Bartolini*, 299 Mass. 503, 510-511 (evidence that defendant physically abused victim within month prior to her death properly admissible on issue of motive), cert. denied, 304 U.S. 565 (1938).

There was other evidence of the status of the Gils' marital relationship. Moseley testified that Gil had physically abused his wife in Moseley's presence on more than five occasions during 1977 and 1978. This evidence, taken alone, concerns events which occurred four years before Maria's death and probably would not be probative of Gil's motive to murder in August, 1982. However, evidence of a continuing animosity between a defendant and a victim spouse, existing closer in time to the victim's death, may render the earlier evidence relevant on the issue of the defendant's motive to kill. See *Commonwealth* v. *Burke, supra; Commonwealth* v. *Abbott, supra.* There was evidence that Gil and Maria did not reconcile and remained separated until the date of the killings. The defense did not demonstrate any improvement in their poor marital relationship which would diminish the continuing probative value of the restraining orders.[10] Maria obtained the restraining

---

[10] Trooper Brooks testified that Gil had told him that the restraining orders issued because his attempt to aid his inebriated wife resulted in her taking a fall. This evidence would not make the evidence of the restraining orders less relevant. Neither would Brook's testimony that Gil had said that he last saw his wife alive at a restaurant where they met to discuss the sale of one of their properties.

orders in January, 1982. To obtain these orders, she filed a "petition for protection from abuse" and had to show, inter alia, that the defendant either harmed her, attempted to harm her, or placed her "in fear of imminent serious physical harm." G. L. c. 209A, §§ 1 & 3, inserted by St. 1978, c. 447, § 2. Thus, the restraining orders were probative of a continuing hostility between husband and wife seven months before the killings. Moreover, as the judge noted, the orders were to remain in effect, pursuant to G. L. c. 209A, § 3, for one year from the date of issuance. See G. L. c. 209A, § 3. We conclude that the judge acted within his sound discretion when he admitted the orders as relevant to the Gils' marital relationship and to the defendant's motive to murder existing on August 15 and 16, 1982. Similarly, the testimony concerning Gil's physical abuse of Maria during 1977 and 1978 became relevant by virtue of the evidence of a continuing hostility between the Gils during a time in much closer proximity to the killings. See *Commonwealth* v. *Burke, supra.*

The judge excluded the face sheet of the orders which contained language which he believed would be prejudicial to the defendant. The judge also gave cautionary instructions to the jury prior to admitting the orders and in his final charge. The judge further cautioned the jury that only if they found, beyond a reasonable doubt, that the evidence was probative of Maria's state of mind and of her husband's knowledge thereof on August 15 and 16, 1982, could they consider the evidence on the issue of motive. Thus, we conclude, additionally, that the judge minimized any possible prejudicial effect which could result from the admission of the orders. See *Commonwealth* v. *Gilbert, supra.*

3. *Hearsay evidence.* Over the defendant's objection, the judge admitted Moseley's testimony that, in 1975, Maria had told him that she had tried to leave her husband once and that Gil had threatened to kill her if she ever tried to leave him again. The judge admitted this testimony as evidence of the Gils' marital relationship and of Maria's state of mind toward her husband. The defendant argues that the admission of this testimony constituted reversible error, since the evidence was

inadmissible multiple hearsay and too remote in time to be probative of motive. We need only address the first contention, as the remoteness issue has been resolved by our prior discussion.

Moseley's testimony constitutes hearsay, since it serves to establish the truth of a statement made by another declarant who is not available for cross-examination. See *Commonwealth* v. *DelValle,* 351 Mass. 489, 491 (1966). The testimony is multiple hearsay because the witness Moseley personally did not hear the defendant's statement. See *Bouchie* v. *Murray,* 376 Mass. 524, 529-530 (1978). Hearsay included within hearsay is not admissible unless each of the multiple statements falls within an exception to the hearsay rules. See *Bouchie* v. *Murray, supra* at 530; P.J. Liacos, Massachusetts Evidence 334 (5th ed. 1981); Proposed Mass. R. Evid. 805 and Fed. R. Evid. 805.

Moseley's testimony relating Maria's statements as to what the defendant had said to her cannot survive the application of the hearsay rule. We have held that "evidence of threats preceding a crime can properly come only from one who heard or witnessed them. It is only such a witness whose evidence can be tested under cross-examination on all the factors which may give life and credence to the threats of which he tells." *Commonwealth* v. *DelValle, supra* at 495. In *DelValle,* the witness testified that two days before the killing the victim had told him that the defendants had threatened the victim with death. *Id.* at 490-491. We ruled that the witness's testimony amounted to inadmissible hearsay since its value depended on the credibility of the victim, thereby denying the defendant the right to a meaningful cross-examination on this statement. In the instant case the judge erred in admitting the testimony concerning the threat.

The prosecutor referred to the hearsay statement once in his closing argument. It is true that the improperly admitted statement arguably was the strongest evidence of Gil's motive to murder. However, the restraining orders and the testimony that Gil had physically abused his wife also constituted evidence relating to motive which was closer in proximity to the murders.

More importantly, the Commonwealth presented extremely compelling circumstantial evidence of Gil's culpability. Under the circumstances, we conclude that the improperly admitted statement was merely cumulative, and no prejudicial error resulted thereby. See *Commonwealth* v. *Lowe,* 391 Mass. 97, 106 (1984); *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 342 (1983).

4. *Impeachment testimony.* The defendant objected to the testimony of State Trooper John Sprague, in rebuttal, as to his conversation with Sabrina Gil concerning her activities on August 15 and 16, 1982. The judge allowed Trooper Sprague to testify as to inconsistencies between Sabrina Gil's trial testimony and the officer's recollection of their conversation on August 16. The defendant now contends that the judge committed reversible error in admitting Sprague's testimony.

It is a well-established rule of evidence that, when a witness testifies at trial to a fact that is relevant to an issue at trial, then the adverse party may seek to impeach the credibility of that witness by showing that the latter previously had made statements which are inconsistent with the testimony given at trial. See *Commonwealth* v. *West,* 312 Mass. 438, 440 (1942); *Langan* v. *Pianowski,* 307 Mass. 149, 151 (1940). At trial, when asked about her whereabouts on August 15 and 16, Sabrina Gil testified that on August 15 she arrived home about 10 P.M. She testified that she had not seen her brother or his truck either that evening or the following morning when she left for work. She also testified that two officers had interviewed her on August 16. She recalled the officers' asking her a few questions about where her brother could be found. On cross-examination Sabrina claimed that she did not remember if the officers questioned her about her whereabouts on August 15 and 16. Her testimony related to the important issue whether her brother was at home, as he and his mother claimed, from midnight until 7 A.M. on August 16. The testimony concerning her whereabouts the evening of August 15 and the morning of August 16 entitled the Commonwealth to present conflicting rebuttal evidence by the officer who had previously interviewed her concerning these same activities. *Commonwealth* v. *West, supra.*

When a witness testifies to a failure of memory on a certain matter, previous statements by the witness concerning the same matter are not inconsistent with her trial testimony. See *Corsick* v. *Boston Elevated Ry.*, 218 Mass. 144, 147 (1914); *Commonwealth* v. *Chin Kee*, 283 Mass. 248, 261-262 (1933). However, Sabrina Gil did testify as to her whereabouts on August 15 and 16. She also remembered the interview with Trooper Sprague on August 16. Her failure to recall her prior discussion of her activities did not preclude the introduction of impeachment testimony from Trooper Sprague. Cf. *Langan* v. *Pianowski, supra* at 152 (a witness who actually made statement contradictory to trial testimony cannot escape impeachment by saying he does not remember making the statement).

Sprague testified that on August 16, when he asked Sabrina Gil about her whereabouts on August 15, she recalled seeing her brother's truck and seeing her brother asleep in her mother's apartment the evening of August 15. This statement conflicted with her testimony at trial that she saw neither Gil nor his truck that night. The judge did not abuse his discretion in admitting Sprague's impeachment testimony.

The defendant cannot prevail on his claim that the judge prejudiced his rights by failing to give a limiting charge that the prior inconsistent statements were to be considered only as to their effect on the weight accorded Sabrina Gil's testimony at trial. By failing to request such a limiting instruction, the defendant implicitly allowed consideration of the prior inconsistent statement as substantive evidence. See *Commonwealth* v. *Costa,* 354 Mass. 757 (1968); *Leavitt* v. *Maynes,* 228 Mass. 350, 353-354 (1917); Proposed Mass. R. Evid. 105, and Fed. R. Evid. 105. See also *Commonwealth* v. *Pinnick,* 354 Mass. 13, 16-17 (1968).

5. *Review pursuant to G. L. c. 278, § 33E.* a. *Absence of a jury instruction on intoxication.* The defendant asks us to utilize our powers under G. L. c. 278, § 33E, to reduce his convictions to murder in the second degree because the judge failed to instruct the jury on alcohol intoxication as a mitigating factor in the crimes charged. The defendant's failure to request this specific instruction at trial and to take proper exceptions to

the judge's failure to so instruct requires that we reduce the verdicts only if we conclude that the omission of the instructions presented a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Atkins,* 386 Mass. 593, 596 (1982); *Commonwealth* v. *Porter,* 384 Mass. 647, 655-656 (1981); G. L. c. 278, § 33E.

In an appropriate case, a judge should instruct a jury that if the defendant is so intoxicated that he is mentally incapable of deliberate premeditation, then he cannot be found guilty of murder in the first degree on the ground of deliberate premeditation with malice aforethought. See *Commonwealth* v. *Costa,* 360 Mass. 177, 186 (1971); *Commonwealth* v. *Parsons,* 195 Mass. 560, 571 (1907). The difficulty with the defendant's claim here is twofold. First, his defense was alibi, not intoxication. Second, there was no evidence of intoxication at the time of the crimes sufficient to raise the issue. There is no basis to disturb the convictions on this claim. Where, as in the instant case, the defendant does not rely on intoxication as a mitigating factor at trial and presents no evidence on the issue, an instruction on intoxication is not warranted. See *Commonwealth* v. *Chasson,* 383 Mass. 183, 188 n.1 (1981). Compare *Commonwealth* v. *King,* 374 Mass. 501, 507-508 (1978). There is no substantial risk of a miscarriage of justice.

b. *The charge on circumstantial evidence.* The defendant claims that his rights were gravely prejudiced and that he should be granted a new trial due to a portion of the judge's charge wherein the judge defined circumstantial evidence by the "footprints in the snow" analogy. That part of the charge, the defendant contends, caused the jury to think that the judge believed the Commonwealth's circumstantial evidence and wanted them to infer that the impressions in the blood at Dundulis were made by Gil's shoes. The defendant objected to the challenged portion of the charge, and the judge gave a further instruction, explaining that the "footprints" analogy was merely an illustration how one drew an inference from circumstantial evidence, and that he did not intend to make any reference to the evidence in the case. The judge reiterated that the Commonwealth's case, based on circumstantial evidence, must "be such as to

produce a moral certainty of guilt and to exclude any other . . . reasonable theory." The defendant took no exception to the judge's revised instruction.

The judge's original instruction analogized the drawing of inferences from circumstantial evidence to a situation where "footprints are discovered after a recent snow. Upon observing them, a person can ascertain that some animated being has passed over the snow since it fell; and from the form and number of footprints, it can be determined with equal certainty whether they are of a man, a bird or a four-footed animal. That is an example of common experience." The judge went on to instruct the jury that "[c]ircumstantial evidence, therefore, is founded on common experience and observed facts and coincidences establishing a connection between the known and proved facts and a fact sought to be proved. . . . The disadvantages of circumstantial evidence, obviously, are that a jury has not only to weigh the evidence of facts but to draw just conclusions from them. It is manifest, then, that great care and caution ought to be used in drawing inferences from proved fact. It must be a fair and natural and not a forced and artificial conclusion." The judge gave the challenged part of his charge in the context of a general discussion about the merits and disadvantages of drawing inferences from circumstantial evidence. We do not think that the coincidental similarity between the well-known "footprints in the snow" example and the evidence of footprints on the floor at the scene of the crime would make the jury reasonably believe that the judge was expressing his belief in the Commonwealth's theory of the case or was favoring a particular inference propounded by the prosecutor. See *Commonwealth* v. *Sneed,* 376 Mass. 867, 873 (1978); *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 752-753 (1961). If there was any possibility of such confusion by the jurors, the judge's subsequent clarification was more than adequate to dispel it. No substantial risk of a miscarriage of justice is involved here.

As G. L. c. 278, § 33E, requires, we have examined the entire case on the law and the evidence, and we conclude that

the interests of justice do not warrant the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*