## COMMONWEALTH *vs.* DARRELL SHARPE.

Plymouth. May 8, 2009. - June 22, 2009.

Present: IRELAND, SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Evidence,* Hearsay, State of mind, Prior misconduct, Pattern of conduct, Relevancy and materiality. *Abuse Prevention. Practice, Criminal,* New trial, Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel.

A criminal defendant convicted of murder in the first degree failed to demonstrate either prejudicial error or a substantial likelihood of a miscarriage of justice arising from the admission in evidence of certain hearsay statements of the victim to show her state of mind, where there was direct evidence (or evidence from which it reasonably could be inferred) that the defendant was aware of the victim's state of mind. [141-143]

At the trial of an indictment charging the defendant with the murder of his girl friend, the judge did not err in admitting evidence that the defendant had abused a former girl friend several years earlier, where such evidence was relevant to the questions of motive and intent, tended to refute the defendant's claim of rage or sudden combat, and was not too remote to be probative, given that it demonstrated an ongoing and overlapping pattern of similar conduct [143-144]; further, testimony that the defendant's former wife obtained an abuse prevention order against the defendant, although admitted in error, contained no prejudicial detail [144], and the judge did not commit an abuse of discretion in admitting evidence of the defendant's prior bad acts toward the victim, where such evidence was relevant to show the existence of a hostile relationship (which in turn was relevant to the defendant's motive to kill the victim), and where such evidence was probative of the continuing animosity in their relationship [144-145].

At the trial of an indictment charging the defendant with the murder of his girl friend, the judge did not err in excluding from evidence affidavits that the victim submitted at the time she sought and obtained four abuse prevention orders, where there was no indication in the affidavits that the victim had provoked the defendant's conduct on those occasions (as alleged by the defendant), and where the defendant was not prevented from offering other, reliable evidence that the victim had provoked him at the time of the killing. [145-146]

A Superior Court judge did not commit an abuse of discretion in denying a criminal defendant's motion for a new trial, which was based on interrelated claims of an unknowing and involuntary waiver of his right not to testify and ineffective assistance of counsel, allegedly for pressuring the defendant to testify, based on findings that the judge (who was also the trial judge) had engaged the defendant in a colloquy prior to his testimony

at trial, and found that the defendant understood his right to testify or not testify; that the defendant himself had made the decision to testify after conferring with counsel; that the defendant decided to testify willingly, freely, and voluntarily; and that counsel's decision to call the defendant to testify was not manifestly unreasonable in the circumstances. [146-147]

INDICTMENT found and returned in the Superior Court Department on February 12, 2001.

The case was tried before *Thomas E. Connolly,* J., and a motion for a new trial was heard by him.

*Richard J. Shea* for the defendant.

*Laurie S. Yeshulas,* Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on all three theories: deliberate premeditation, extreme atrocity or cruelty, and felony-murder. The victim was his girl friend. On appeal he alleges error in (1) the admission of hearsay statements of the victim to show her state of mind; (2) the admission of evidence of his prior bad acts toward other women; (3) the admission of evidence of his prior bad acts toward the victim; (4) the refusal to admit the victim's affidavits in support of her applications for orders under G. L. c. 209A; and (5) the denial of the defendant's motion for a new trial based on interrelated claims of an unknowing and involuntary waiver of his right not to testify and ineffective assistance of counsel, allegedly for pressuring the defendant to testify. We affirm the judgment and decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* The defendant and the victim began living together in 1994 in the Roxbury section of Boston. The victim's then nine year old son lived with them. The defendant and the victim argued frequently about money throughout their relationship. In May, 2000, they moved to Brockton. The victim secured an apartment through an organization that helped homeless people. Rent was waived on condition that only she and her son would occupy the apartment. The defendant lived with them, in breach of that condition. The victim worked part time at a local newspaper and attended college.

In October, 2000, the victim applied for and was determined to be eligible under the Federal "Section 8" housing program. She was planning to get a different apartment and live separately

from the defendant. In late November the defendant approached a friend and asked for help getting an apartment because he was having problems with his girl friend.

The victim told her son, her sister, and a friend that she did not want the defendant to live with her when she moved to her new apartment. She told her friend that she thought the defendant was seeing another woman. She told her friend and her sister that the defendant had asked her to use her student loan money and to pawn her computer to satisfy an outstanding court order that he pay restitution, but she refused to give him the money he needed.

On January 3, 2001, the defendant approached his cousin, Homer Bosh, with whom he had not spoken in nearly ten years, and asked if he could borrow between $1,800 and $2,000 to satisfy the court order for restitution. He needed the money for a court appearance the next day, and if he could not come up with the money he would be sent to jail. Bosh told the defendant he did not have that kind of money. He never heard from the defendant again.

In the late evening of January 3, the defendant and the victim were heard arguing inside the victim's apartment. One tenant heard the defendant shout, "Shut the fuck up and do what I tell you." The argument lasted about five minutes, ending abruptly with a "blood-curdling scream" followed by a loud thump.

On January 4, the defendant failed to pay the court-ordered restitution. He went to the apartment of Cheryl Scott, a woman with whom he was trying to start a relationship. He had invited her out for a New Year's Eve party, but she declined because she was engaged to be married. When he arrived at her apartment he had a bag of money and gifts for her and her children. He treated them to meals at a fast food restaurant. He previously had told her he was living with his mother, and he never mentioned the victim.

The defendant was treated at a local hospital from January 7 to January 9 for a possible drug overdose. He told hospital personnel he was recently divorced and missed his wife. His physical examination revealed an old abrasion on his left leg.

The victim failed to meet a friend at a prearranged time on the morning of January 4. She did not appear at work, as scheduled,

on January 5 and 6. A case worker from the homeless organization paid the victim weekly visits, but received no response from her on January 9. On January 16, the case worker again received no response after knocking, but entered the apartment after she noticed a bedroom window was off its track. Although there was an odor of freshly cooked food, she saw no one. The victim's computer, printer, and a television were missing. When she opened the victim's son's bedroom door, she was overcome by a "very foul odor," a stench of something dead. The odor was more pronounced in the bedroom closet, and made her nauseous. She saw dirty clothes piled up in the closet, but she did not probe.

The case worker entered the victim's bedroom where she noticed a small doormat that appeared out of place in the middle of the room. Underneath was a reddish-brown stain on the carpet. She discovered the defendant hiding in the closet and asked him where the victim was. He said she was in school. Asked about the stain on the carpet, the defendant said it was caused by the victim's son. He also explained that he had just cooked a sandwich for the victim's son at the victim's request. However, the case worker knew none of this could be true because the boy had been in the custody of the Department of Youth Services (department) since about Thanksgiving, 2000. The case worker told the defendant he was not allowed in the apartment, and they both left.

The case worker returned to the apartment on January 18, 2001, with a maintenance man to repair the bedroom window. The clothes that had been piled up in the victim's son's bedroom closet were now covering the stain on the carpet in the victim's bedroom, and the foul odor in the son's closet had abated.

The next day the defendant was arrested on a warrant for failure to pay the court-ordered restitution. Sergeant Paul L'Italien with the State police was at the victim's apartment with other officers investigating a missing person report concerning the victim. He left and went to the Brockton police station where he advised the defendant of his Miranda rights and interviewed him to gather information about the victim. The defendant told him he was no longer in a relationship with the victim because of financial issues, although they were still friends. He said he was never able to provide her any money. The defendant acknowledged living in her apartment and that he was not supposed to live there. He

further stated he knew she was saving her money to get her own apartment. The defendant told L'Italien he last saw the victim on January 3, 2001, and he last spoke with her on January 5. He claimed he had been staying with friends in Boston, although he could not remember their full names or their addresses.

Confronted with the evidence that recently he was seen in the victim's apartment, the defendant admitted he had been there five or six times since January 5, but never for more than fifteen or twenty minutes. He denied seeing any stains on the carpet or smelling any foul odors. He later admitted that he told the case worker from the organization for the homeless that the victim's son had stained the carpet. L'Italien confronted him with the fact that the victim's son could not have done it because he was in the custody of the department since Thanksgiving. The defendant could not explain the inconsistency.

L'Italien asked the defendant about certain abuse prevention orders against him that the victim had obtained pursuant to G. L. c. 209A. The defendant admitted he pushed the victim, but claimed he never hit her. He explained that what appeared to be a knife wound on his left leg was an injury he sustained by slipping and falling on ice. He claimed he was treated at a Brockton hospital, but a later investigation revealed that the hospital had no record of his being there. He denied seeing Cheryl Scott during the week of January 4, and said he stayed inside the victim's apartment all week with the flu, contradicting an earlier statement that he had not been staying in that apartment.

In the meantime other police officers who had been at the victim's apartment telephoned L'Italien and informed him that the victim's body was found in a storage bin in the laundry area of the apartment building. L'Italien so informed the defendant, who denied ever being in the storage bins but said he had used the laundry facilities. He was placed under arrest for murder and police seized the pants he was wearing, which appeared to have blood stains.

The medical examiner determined the victim died between January 3 and January 4. She had sustained seven distinct wounds: two to the left side of her forehead, one to the mid-forehead, one to the left temple, one behind her right ear, and two under her chin. All of the injuries were inflicted about the

time of her death. All but one blow under her chin would have rendered her unconscious. Her lower jaw had been split in half. The most severe injury was to the left side of her forehead, and a bone fragment had been forced into her brain. Three other depressed skull fractures each would have been fatal. The chin injuries were consistent with the claw end of a hammer, while the others were consistent with the ball end of a hammer.

Blood stains on the victim's bureau drawer and box spring matched her deoxyribonucleic acid (DNA). The location of blood stains and spattering on objects in the bedroom were consistent with the victim being struck with a hammer while she was lying on the floor. Blood on the defendant's pants matched the victim's DNA. The "tremendous decomposition" odor in the closet was consistent with the victim's body having been stored there, and foot tracks in blood stains on the floor in the victim's son's bedroom were consistent with a body being dragged through the blood.

At trial, the defendant called family members to testify about his relationship with the victim, and that they argued frequently. The defendant testified. He had known the victim for nine years, and they began living together in Roxbury. They argued often, usually about money and her belief that he was seeing other women.

The defendant testified that on January 3, 2001, he visited a friend in Boston, then returned to the victim's apartment at about 3:30 A.M. on January 4, intoxicated, and slept on the couch. The victim woke him shortly before 9 A.M., and they argued. She accused him of having been with another woman and wanted him to leave. They argued over possession of various computers and televisions. The victim went into the kitchen and came out with a hammer. She demanded that he leave without taking anything. She swung the hammer at him, hitting the bedroom window and knocking it off its track. They struggled and he disarmed her. He went into the bathroom to take a shower and get ready for court. She attacked him with the hammer, striking him in the leg. He took the hammer from her and struck her in the head several times. By that point she had fallen onto the bedroom floor. He was in a rage as he struck her several times with the hammer. After he calmed down he stayed with her body for hours.

The defendant visited Cheryl Scott and her family later that day. When he returned to the victim's apartment that evening he cleaned up the blood. He hid the victim's body in the closet the next day, then moved it to the storage bin after the case worker from the homeless organization visited the apartment.

The defendant denied knowledge of the victim's missing possessions. He claimed the television set he pawned was his, as was the computer he took to a friend to sell. He acknowledged he had no money to pay the restitution order, but denied ever asking the victim to give him money for it.

The Commonwealth presented two rebuttal witnesses. The maintenance man who repaired the bedroom window testified that the window frame was bent inward, not outward, which suggests that it was struck by a hammer from outside the apartment. A nurse who treated the defendant on January 7, 2001, testified that the defendant did not have a leg wound (seen by Sergeant L'Italien on January 19) when he presented himself at the hospital, which suggests the victim did not strike him with a hammer.

2. *Hearsay and victim's state of mind.* The defendant argues that it was error to admit hearsay statements of the victim to show her state of mind because there was no evidence that he was aware of her state of mind. The victim had told her son and the case worker from the homeless organization that she was planning to move, and the defendant would not be joining them. The defendant objected to this testimony, so we review under the prejudicial error standard. See *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 246 (2000). The victim had told a friend the same thing, but also said she suspected the defendant was seeing another woman, that he did not contribute financially to the relationship, that he lied, that she did not trust him, and that she refused his requests for money to pay toward his restitution obligation. There was no objection to the friend's testimony, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

"The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and

only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it." *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997), *S.C.*, 440 Mass. 576 (2003).

There was evidence that the defendant knew the victim was planning to move without him to a new apartment. In late November he had asked a friend to help him get an apartment because he was having problems with his girl friend. The jury could infer he meant the victim and that he implied they were separating. There was no error in the admission of testimony from all three witnesses to the effect that the victim said she was getting a new apartment and the defendant would not be joining her.

Similarly, there was no error in the admission of evidence that the victim told her friend that the defendant did not contribute to their household expenses, and that she refused his request for the restitution money. The victim's son testified that the victim and the defendant often argued over money. The defendant told L'Italien that he was never able to provide her any money and their relationship ended over financial issues. He also told L'Italien the victim had been saving money for her new apartment. The defendant's cousin testified that on January 3, 2001, the defendant approached him, for the first time in ten years, and asked to borrow nearly $2,000 to pay court-ordered restitution that was due the next day. There was ample evidence that the defendant failed to contribute to household expenses. The jury could have inferred that the defendant's desperate eleventh-hour attempt to obtain the restitution money from his cousin, who he had not seen in a decade, was occasioned by an earlier and unsuccessful attempt to get money from the victim, which he knew she had saved. See *Commonwealth* v. *Mendes*, 441 Mass. 459, 472 (2004). There was no error in the admission of this evidence of the victim's state of mind.

Although there was no direct evidence that the defendant was aware that the victim believed that he lied and that she did not trust him, these areas are of little significance, but reasonably could be inferred from the defendant's failure to contribute financially to the household and her intention to separate from him. There was no error.

The matter of infidelity is somewhat more problematic, but it did not create a substantial likelihood of a miscarriage of justice. Cheryl Scott testified that shortly after Christmas, 2000, the defendant brought her to the apartment he claimed was his mother's, which in fact was the victim's apartment. The jury could have inferred that the defendant was preparing for a significant confrontation with the victim by inviting a woman to the victim's apartment, and that he stood indifferent to whether she might become upset if she ever learned of this event, of which there was a significant likelihood. Moreover, any error was vitiated when the defendant himself testified that the victim and he often argued over her suspicions that he was involved with other women, and that she accused him of being with another woman just before he killed her.

3. *Prior bad acts.* The defendant argues that the judge abused his discretion by admitting evidence that he committed bad acts toward other women. Evidence of prior bad acts may not be used to show bad character or propensity to commit the crime charged, *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985), cert. denied, 519 U.S. 1045 (1986), but such evidence may be admitted to show "a common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). If relevant, the judge must determine that its probative value outweighs its potential prejudice. *Id.* at 225. The decision to admit such evidence is committed to the sound discretion of the judge. *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995). The defendant timely objected in each instance.

There was evidence that the defendant had abused a former girl friend with whom he lived from 1991 to 1995. On several occasions he would look for money in their apartment and they argued. He smashed things and punched her. In one such argument, which ended their relationship, he threatened to kill her with a knife in front of their child. The evidence was relevant because it showed a pattern of conduct involving arguments over money with significant women in his life, and the use of a dangerous weapon when the relationship approached the point of disintegration. The evidence also was relevant to the questions of motive and intent when using force and a dangerous weapon to

get money from a woman with whom he has been intimate, and it tended to refute the defendant's claim of rage or sudden combat. See *Commonwealth* v. *Helfant*, *supra* at 227 (evidence relevant to rebut defense).

The defendant also argues that this prior bad act evidence is too remote to be probative, having occurred at least seven years before the crime charged. See *Commonwealth* v. *Gil*, 393 Mass. 204, 216 (1984). We disagree. The defendant entered into a financially dependent relationship with the victim almost immediately after his similar relationship with his prior girl friend had ended. Both relationships were characterized by frequent arguments over money, and both relationships ended with a confrontation in which the defendant resorted to the use of a dangerous weapon. In each instance there was a continuum of similar conduct throughout the relationship, with a progression toward the use of dangerous weapons. Temporal remoteness of the conduct is less significant where there is an ongoing and overlapping pattern of similar conduct, as here. See *Commonwealth* v. *Helfant*, *supra* at 228. There was no abuse of discretion in the admission of this evidence.

The judge admitted evidence, over objection, that the defendant's former wife obtained a G. L. c. 209A abuse prevention order against him in 1993. The judge disallowed the actual order, but admitted testimony that she obtained the order. Nothing beyond the issuance of the order was admitted. Admission of this testimony was an abuse of discretion. Testimony about that order was not probative of motive or pattern of conduct, and the order was too remote in time to have any probative value. See *Commonwealth* v. *Gil*, *supra*. However, the defendant has not shown that he was prejudiced. The testimony lacked any prejudicial detail, and there were the four other abuse prevention orders that properly were admitted.

The defendant next argues that the judge abused his discretion by admitting evidence of his prior bad acts against the victim. This evidence includes four abuse prevention orders under G. L. c. 209A that the victim obtained against him between 1995 and 1997, and evidence that he manhandled her on two occasions in the spring of 1999 and in May, 2000. The defendant timely objected. This evidence was relevant to show the existence of a hostile

relationship, which in turn was relevant to the defendant's motive to kill the victim. See *Commonwealth* v. *Burke*, 339 Mass. 521, 533-534 (1959). See also *Commonwealth* v. *Eugene*, 438 Mass. 343, 348-349 (2003) (abuse prevention order admissible to show status of relationship and motive to murder); *Commonwealth* v. *Gil*, *supra* at 215-216 (same). Although the abuse prevention orders ordinarily would be too remote in the sense that the most recent had been issued three years before the killing, see *id.* at 216, they retained their probative value because of the "continuing animosity" in the relationship, evidenced by the incidents of 1999 and 2000. *Id.* The judge did not abuse his discretion.

4. *G. L. c. 209A affidavits.* The defendant contends it was error to exclude affidavits of the victim submitted at the time she sought and obtained the four abuse prevention orders. He argues that, if the abuse prevention orders are admissible, then the affidavits should be admissible under the doctrine of verbal completeness. See *Commonwealth* v. *Tennison*, 440 Mass. 553, 563 (2003). His purpose for offering the affidavits was to show the victim's state of mind, and in particular that she provoked the defendant's conduct that gave rise to the abuse prevention orders. This, he argues, is relevant to whether the victim provoked him at the time of the killing. The doctrine of verbal completeness does not apply because the victim's affidavits, although presumably the basis on which the abuse prevention orders were issued, were separate and distinct from the orders. *Id.*, citing *Commonwealth* v. *Watson*, 377 Mass. 814, 825-834 (1979).

We do not foreclose the possibility that in certain circumstances such affidavits, although inadmissible hearsay, when offered by a defendant to show that the victim provoked hostility which led to the issuance of an abuse prevention order, might be admissible. See *Chambers* v. *Mississippi*, 410 U.S. 284, 302 (1973) ("hearsay rule may not be applied mechanistically to defeat the ends of justice" where statements are highly trustworthy); *Commonwealth* v. *Evans*, 438 Mass. 142, 154-156 (2002), cert. denied, 538 U.S. 966 (2003). This is not such a case.

We have reviewed the affidavits in question and find no indication therein that the victim provoked the defendant prior to the issuance of the abuse prevention orders. Moreover, the orders were issued between four and six years before the killing.

The defendant was not prevented by a mechanistic application of the hearsay rule from offering reliable evidence that the victim provoked him at the time of the killing. Defense counsel was able to plant the seed that the victim herself could be violent toward the defendant. He elicited testimony from one Commonwealth witness who was with the victim when she struck the defendant with her car in 1998 or 1999 after seeing him with another woman. This tended to support the defendant's testimony that the victim provoked him to kill her because it suggested if she were capable of attacking him with a car, she certainly was capable of attacking him with a hammer. There was no error.

5. *Denial of motion for a new trial.* The defendant argues that it was error to deny his motion for a new trial, which alleged that he did not knowingly and voluntarily waive his right not to testify. This claim was interwoven with an allegation of ineffective assistance of counsel based on undue pressure to testify placed on him by counsel. After an evidentiary hearing, the motion judge, who was also the trial judge, denied the motion. The judge found that he, the judge, engaged the defendant in a colloquy prior to his testimony at trial, and he found that the defendant understood his right to testify, or not testify. The judge further found that the defendant himself made the decision to testify after conferring with counsel and his family, and that the defendant decided to testify willingly, freely, and voluntarily. Although the court stenographer did not record the colloquy, the judge settled the matter and corrected the record to reflect what actually occurred, pursuant to his authority under Mass. R. A. P. 8 (e), as amended, 378 Mass. 932 (1979). The judge also found that counsel was not ineffective in calling the defendant to testify. The strategy, he found, was reasonable and perhaps the only way to obtain a verdict of murder in the second degree.

We review a judge's decision on a motion for a new trial under the abuse of discretion standard. *Commonwealth* v. *Clemente*, 452 Mass. 295, 304 (2008), cert. denied, 129 S. Ct. 1329 (2009). Where a claim of ineffective assistance of counsel is raised in the motion, and where the appeal from the denial of the motion is heard with the direct appeal under G. L. c. 278, § 33E, as here, we review to determine whether any conduct or omission

by counsel "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). See *Commonwealth* v. *Morales*, 453 Mass. 40, 44 (2009). Findings of fact after an evidentiary hearing on the motion will not be disturbed on appeal if supported by the record. *Commonwealth* v. *Bernier*, 359 Mass. 13, 16 (1971). We defer to a judge's credibility assessments, and we extend special deference to the action of a motion judge who also was the trial judge. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

The judge's findings that the defendant understood that he had the right to testify or not testify, and that the decision was his alone to make, is supported by the record. We accept the judge's finding that the defendant made the decision to testify voluntarily and intelligently. The judge based his decision on the colloquy he had with the defendant at trial, and his observations of the defendant's demeanor and interaction with counsel at the trial. The judge acted within his authority and discretion when he rejected the defendant's version of how he came to take the witness stand.

We also agree with the judge's assessment of trial counsel's performance. The case against the defendant was overwhelming and the only realistic chance the defendant had to obtain a verdict of less than murder in the first degree was to take the stand and testify as he did. We conclude that the judge did not abuse his discretion in denying the motion for a new trial, and that trial counsel's decision to call the defendant to testify was not manifestly unreasonable. *Commonwealth* v. *Adams*, 374 Mass. 722, 728-729 (1978).

6. *G. L. c. 278, § 33E.* We have reviewed the entire record, the briefs, and considered arguments of counsel, and see no reason to reduce the degree of guilt or grant a new trial.

*Judgment affirmed.*

*Order denying motion for
a new trial affirmed.*