SUPERIOR COURT 
 
 COMMONWEALTH VS. RAUL MARTINEZ

 
 Docket:
 1977CR00468
 
 
 Dates:
 August 21, 2020
 
 
 Present:
 /s/Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS (Paper No. 17)
 
 

             On September 25, 2019, the Grand Jury returned four indictments against defendant Raul Martinez ("Martinez")
            On July 23, 2020, the Court conducted a hearing on Defendant's Motion To Dismiss ("Motion") wherein he seeks the dismissal of all four of the indictments. (Paper No. 17). Martinez argues that the Commonwealth failed to present sufficient evidence to the Grand Jury to support a finding of probable cause that he committed the offenses charged in the indictments and that the indictments must be dismissed pursuant to Commonwealth v. McCarthy, 385 Mass. 160 (1982).
            As explained below, after thorough consideration of the transcripts of the Grand Jury proceedings, the Grand Jury exhibits, the submissions of the parties, and the arguments of counsel, the Motion is ALLOWED.
                                                            Page 1 of 21
BACKGROUND
            The Commonwealth presented evidence to the Grand Jury on the following dates: August 7 and 22, and September 5, 11, 12, and 25, 2019. The evidence included the testimony of two witnesses[1] and the submission of 62 exhibits. The exhibits included transcripts of communications intercepted by the investigators, photographs, certificates of drug analyses, ballistics certificates, bank records, etc.
            The following is a summary of evidence presented by the Commonwealth to the Grand Jury that is material and relevant to the Court's determination of the Motion.[2]
Start Of Investigation 
            In fall 2017, Noonan and other investigators from the MSP and Drug Enforcement Administration ("DEA") began investigating a narcotics distribution network in the Lawrence area. Noonan and Sgt. Daniel Clemens ("Clemens") were the co-case officers leading the investigation.[3] The initial target of the investigation was Robinson ("Papa") Adames Abreu ("Abreu"), who investigators suspected was selling fentanyl, heroin, and cocaine in the Lawrence area. Investigators learned cell phone numbers used by Abreu and identified "runners" he used to deliver drugs to buyers. Investigators also learned two locations Abreu used to distribute and store ("stash") drugs: an auto
---------------------------
[1] Trooper Robert Noonan ("Noonan") of the Massachusetts State Police ("MSP") and Yvette Veras-Guerra, the owner of a building located at 572 Essex St., Lawrence, MA ("Building").
[2] Additional evidence is set forth in the Discussion section, infra.
[3] Noonan is a well-trained and highly experienced narcotics trafficking investigator. He has extensive experience conducting surveillance and controlled buys of narcotics, working with confidential informants, interacting with drug dealers and users, and drafting and executing search warrants in trafficking investigations. Noonan has significant training and experience regarding the composition, street value, street nomenclature, packaging, and distribution of narcotics in Massachusetts (especially Lawrence) such as fentanyl, crack, cocaine, and heroin.
                                                            Page 2 of 21
body garage located at 333 Methuen St., Lawrence ("Garage") and an apartment at 46 — 48 Cypress Ave., Methuen.[4]
Undercover Controlled Purchases of Drugs 
            Clemens eventually arranged eleven undercover purchases of drugs (heroin, fentanyl, and cocaine) from Abreu between November 6, 2017, and March 14, 2019.[5] All occurred in Lawrence. Abreu was present for some of the drug sales and his runners conducted the other transactions.[6] Some of the controlled buys occurred near the Garage.
Expansion Of Investigation Via Wiretaps, GPS Tracking Devices, Etc.
            On March 25, 2019, investigators obtained a wiretap search warrant for a phone number used by Abreu during the controlled buys. This allowed investigators to listen to conversations and read text messages conducted on the cell phone associated with that phone number.
            Beginning on March 26, 2019, investigators intercepted numerous daily communications during which Abreu coordinated the purchase and sale of narcotics. Over the course of the next several weeks, investigators obtained wiretap warrants for
---------------------------
[4] Noonan told the Grand Jury that a "stash" location is a place at which a drug dealer stores drugs to keep it away from the dealer's primary residence.
[5] The first ten controlled purchases occurred in November 2017, December 2017, January 2018, March 2018, and August 2018. The eleventh controlled purchase of narcotics occurred on March 14, 2019.
[6] The other transactions were conducted by the following "runners" employed by Abreu: Nelson Rivera, Isaac Rivera, Jhonny Mota-Rodriguez, and Jose Lugo-Garcia.
                                                            Page 3 of 21
numerous phones associated with Abreu, his runners, his drug suppliers, and many other members of his drug distribution network.[7]
            For example, on March 26, 2019, investigators intercepted many calls made to Abreu during which Abreu arranged the sale of large amounts of narcotics and coordinated the delivery of drugs with Jose Lugo-Garcia ("Lugo-Garcia"). Subsequently, investigators intercepted many communications between Abreu and Lugo-Garcia during which they coordinated the sale of narcotics.
            Investigators obtained search warrants that allowed them to affix GPS tracking devices on vehicles used by Abreu, Lugo-Garcia, and Jhonny Mota-Rodriguez, another of Abreu's runners identified by investigators. They also obtained CSLI and other data regarding cell phones used by them and installed pole cameras outside several locations associated with drug distribution activities. The tracking devices, CSLI, pole cameras, and wiretaps allowed investigators to observe the men coordinate and execute numerous drug transactions during April and May 2019.
            Investigators eventually identified Alberto Santana ("Santana") as one of Abreu's drug suppliers. As the investigation continued, officers intercepted communications in which Nelson ("Periquito") Galan ("Galan") coordinated the purchase of a kilo of cocaine from Santana on behalf of Omar ("Prieto") Acevedo ("Omar").[8] In other communications between Omar, Galan and Santana, they coordinated both purchases and sales of
---------------------------
[7]Many of the communications were in Spanish. Translators and interpreters from the DEA assisted investigators in monitoring and transcribing the communications. The Commonwealth submitted to the Grand Jury transcripts (in English) of numerous communications of members of the drug distribution network.
[8] Because other persons involved have the same surname, the Court will refer herein to Omar Acevedo by his first name.
                                                            Page 4 of 21
drugs. Omar also communicated frequently with Abreu about drug transactions. In addition, investigators continued to observe drug transactions conducted near and inside the Garage. In fact, they observed Santana involved in one such transaction.
572 Essex St., Lawrence, Apartments 2C, 3C, and 6B 
            Officers eventually learned that Galan and Omar were working together for a large drug trafficking organization ("DTO") run by Ramon Cruz Gonzalez ("RCG") and operated from an apartment building located near the Garage at 572 Essex St., Lawrence ("Building"). The Building has 6 floors and 20 apartments. It has interior stairwells between the floors and an elevator. To enter, visitors have to be "buzzed" into the Building.
            Officers determined that the DTO used three apartments inside the Building as its operational center (i.e., Apartments 2C, 3C, and 6B). Apartment 2C is located on the second floor, Apartment 3C is on the third floor, and Apartment 6B is on the sixth floor.
            Yvette Veras-Guerra ("Veras-Guerra") and her husband owned the Building, and served as the landlord after buying the Building on April 25, 2019. After the closing, Veras-Guerra and her husband went to the apartments to greet the tenants and gather their information. At the Grand Jury, she produced a spreadsheet (Ex. 4) that lists the tenants' names and phone numbers, and the amount of their rent.
            Investigators ultimately connected the DTO's drug mixing and packaging operations to Apartment 2C; Galan and Omar's distribution activities to Apartment 3C; and, the distribution activities of Jocheiry Acevedo Hernandez ("JAH") and his girlfriend, Maricely Carrion-Ramos ("MGR"), members of the DTO, to Apartment 6B. However, as is discussed further below, members of the DTO freely accessed all three apartments.
                                                            Page 5 of 21
Further Expansion Of Investigation To Other Members Of The DTO
            Investigators continued to monitor the communications and activities of known members of the DTO, which led them to identify numerous other members.
            For example, on April 30 and May 1, 2019, Santana called Galan and facilitated the purchase of a kilogram of drugs from a third party supplier. Galan referred to JAH during one of the calls. In addition, on May 1, investigators observed Santana exit the Building at the scheduled time of the transaction.
            On May 17, 2019, Michael Figueroa ("Figueroa") called Galan and ordered a "thirty" (i.e., a kilo of cocaine for $30,000). Galan commented that the time chosen for the drug exchange was good because it would be during a police shift change. On May 18, Figueroa and Galan confirmed the time of the drug transaction and Galan told him to take the elevator to the third floor when he arrived for the transaction (i.e., Apartment 3C). Later that day, investigators observed Figueroa arrive at, and enter, the Building at the allotted time. Investigators further observed Figueroa exit the Building and drive away. Officers stopped Figueroa's vehicle and seized a kilogram of cocaine.
Jocheiry Acevedo-Hernandez And Maricely Carrion-Ramos
            Investigators learned that Jocheiry ("Jochi") Acevedo-Hernandez ("JAH") played a significant role in the DTO, especially as a drug "mixer." For example, investigators intercepted many DTO-related communications between Santana and JAH, as well as many instances during which Omar and Galan used the same phone number as JAH to coordinate drug transactions.
                                                            Page 6 of 21
            Officers intercepted Santana and JAH communicating on a regular basis. Investigators determined JAH lived and worked at Apartment 6B. (In fact, during one call, JAH confirmed to a caller he lived at Apartment 6B).
            For example, on May 6, 2019, investigators intercepted a call from JAH to Santana in which JAH told Santana that RCG needed "a kilo." Fifteen minutes later, investigators saw Santana arrive at 15 Ames Street, Lawrence. Santana entered that location, exited two minutes later carrying a black bag, and drove to the Building. Upon arrival, Santana called JAH and told him to "open up." JAH told Santana to call RCG and "then come up to the sixth floor" (i.e., Apartment 6B). The following day, Santana contacted JAH and arranged payment for the previous day's drug transaction. JAH told Santana to go to the second floor of the Building (i.e., Apartment 2C). Shortly thereafter, Santana was observed exiting the Building and driving away.
            On June 15, 2019, investigators intercepted calls that led them to believe that JAH and MCR were going to New York City to pick up drugs and visit MCR's father.
            On June 16, 2019, JAH's phone "pinged" near Yankee Stadium in the Bronx. JAH told a male caller he was in New York "to get two of the white up here." JAH's phone pinged in Massachusetts later that night. As a result, MSP stopped JAH and MCR traveling in a vehicle. They were the sole occupants. MSP found two kilograms of cocaine inside the vehicle. MSP arrested JAH and MCR and charged them with drug offenses (in Middlesex County). That arrest generated a significant amount of discussion and concern by DTO members in intercepted communications.
            After the arrest of JAH and MCR, DTO members communicated frequently about moving contraband from DTO locations. For example, "Orlando" told RCG that JAH had
                                                            Page 7 of 21
been caught with "two things" (i.e., two kilos) and that drugs should be moved from DTO locations.
Israel ("Simpson") Santiago Ortiz
            Investigators determined that RCG was the leader of the DTO.[9] They regularly intercepted RCG giving orders to JAH and Santiago Ortiz about how to mix drugs, who should get what drugs to sell, and how much inventory they should have on hand. Investigators learned that Santiago Ortiz was RCG's trusted lieutenant. Santiago Ortiz carried out various orders made by RCG, handled the finances and bookkeeping of the DTO, and mixed drugs for the DTO.
            For example, on May 30, 2019, investigators heard Santiago Ortiz and RCG discuss DTO finances, i.e., Santiago Ortiz said he was "short" $1,000 or more according to his records, and that the DTO made "a mistake" regarding one of the "bricks." RCG replied and stated that they needed to increase their inventory.
            On June 3, 2019, RCG told Santiago Ortiz to go to JAH's apartment (i.e., Apartment 6B) and prepare some "special lemon." A few minutes later, officers observed RCG and Santiago Ortiz arrive (separately) and enter the Building. After entering, RCG told JAH to "open up" and then told him he was "heading up." A short time later, officers observed RCG exit the Building and drive away. They then heard Abreu call RCG and ask which number to buzz. RCG replied "6B" (i.e., Apartment 6B).
            On June 4, 2019, RCG told "Orlando" and "Bembu" (two unidentified members of the DTO) that Santiago Ortiz was going to mix a special batch of 100 grams of drugs and they would distribute it to customers who would provide feedback on its potency.
---------------------------
[9] Police intercepted Omar and Galan speaking deferentially to, and about, RCG. They referred to RCG as the "boss," "patrone," and "heffa."
                                                            Page 8 of 21
Shortly thereafter, RCG and JAH spoke. JAH said he was at Apartment 6B with "his woman" (i.e., MCR). RCG and JAH then discussed that Santiago Ortiz would be conducting the mixing of the special batch at Apartment 2C. Later that day, Santiago Ortiz and RCG discussed how the odor from mixing the special batch of drugs caused RCG to become nauseous and Santiago Ortiz replied, "ah-ha, that's strong.”[10]
            On June 11, 2019, RCG and Santiago Ortiz exchanged text messages that included images of electronic drug transaction ledgers (i.e., Excel spreadsheets).
            On June 12, 2019, Santiago Ortiz called "Patalarga" (an unidentified male member of the DTO) and told "Patalarga" that he was going to his house to pick up "remotes" (i.e., mechanical hides) before going to "Patalarga's" house. Investigators later observed Santiago Ortiz arrive at his home at 96 Boston St. operating RCG's Honda Accord. Santiago Ortiz went inside for a few minutes. Around this time, RCG called Santiago Ortiz and told him to "bring some baking powder." Thereafter, investigators observed Santiago Ortiz stop briefly at a grocery store and then travel to, and arrive at, the Building. Upon arrival, RCG told Santiago Ortiz to leave the "cooking pot" in his car, and obtain a certain quantity of drugs at 522 Essex St. and bring it to the Building. Thereafter, officers observed Santiago Ortiz enter the Building carrying a black shopping bag.
            On June 17 at 5:03 p.m., "Orlando" called RCG and said that they were cleaning up everything "just in case." "Orlando" referred to RCG as "boss" and told RCG he did not know where to put RCG's "irons" (i.e., firearms). RCG replied to put them outside in
---------------------------
[10] This conversation led investigators to believe that RCG was present in Apartment 2C with Santiago Ortiz when Santiago Ortiz mixed the special batch of drugs.
                                                            Page 9 of 21
the stairs. "Orlando" asked RCG to tell Santiago Ortiz to remove the blender and bags, and RCG replied, "no, that can stay there."
Raul Martinez
            Martinez lived with his wife and children at 47 Exchange St., apartment 2.
            On the morning of June 11, 2019, officers observed RCG and Martinez[11] exit 47 Exchange St. together and drive away separately. Shortly thereafter, RCG and Martinez arrived at 2 Railroad Street. RCG used a key to enter the front door and exited carrying trash. Then, RCG and Martinez carried a sofa into 2 Railroad St. from Martinez's minivan. They then drove away in their separate vehicles.
            On June 17, 2019, Santiago Ortiz was near 525 Essex St. when he received a call from RCG. RCG asked him "if he was ready" because Martinez was going to "swing by there" to get a sofa and TV. RCG told Santiago Ortiz to "bring everything" that comes with the couch "so it looks like we're moving." (RCG was referring to clearing 525 Essex St., Unit 305, of drugs in response to the arrest of JAH and MCR). Shortly thereafter, Martinez arrived at 525 Essex St. driving a black Toyota Sienna minivan.[12] Upon arrival, Santiago Ortiz told Martinez (via telephone) to "come up" to the third floor (i.e., Apartment 305). A short time later, RCG instructed Santiago Ortiz to have Martinez drive around after removing the items and not go directly to his house (i.e., take evasive action), and to make sure they moved everything out. Shortly thereafter, investigators
---------------------------
[11] The transcript (GJM 9/12/19 at p. 50) states that officers observed "on video surveillance Mr. Cruz-Gonzalez and Ramon come out of 47 Exchange Street and get into his Honda." A fair reading is that the reference to "Ramon" was in error and was meant to be a reference to "Raul" (i.e., Raul Martinez).
[12] The minivan was registered to "Raul Martinez Hildago" (and a female) at 47 Exchange Street, apartment 2.
                                                            Page 10 of 21
observed the minivan arrive at 47 Exchange Street. Martinez was driving and Santiago Ortiz was in the passenger seat. The two men exited the vehicle and moved a sofa, a TV and a stereo speaker into 47 Exchange Street.
            Later on the evening of June 17, officers observed Martinez and Santiago Ortiz near the Building and, still later, Martinez picked up Santiago Ortiz at 96 Boston St., Methuen. In addition, that evening Santiago Ortiz told a female that he and "Raul" delivered "candy" and "work" to multiple places per RCG's instructions.
            On June 18, 2019, RCG and Santiago Ortiz discussed having Martinez pick up Santiago Ortiz at the Building.
Execution Of Search Warrant At 47 Exchange St., Apartment 2 
            On June 19, 2019, officers simultaneously executed numerous search warrants of DTO vehicles, cell phones, and locations, including Apartments 2C, 3C, and 6B, and 47 Exchange St., Apartment 2 ("Premises")
            As stated, Martinez and his family resided at the Premises. Martinez, his wife, his two children, and RCG were present inside the Premises when the police executed the search warrant. RCG was sleeping in a bedroom.[13] RCG told the officers he sublet the room from Martinez.
            In another bedroom ("Bedroom E"), officers observed a purple sofa chair located just inside the entrance.[14] The sofa chair had an electronic "hide" that was built into the
---------------------------
[13] The Commonwealth presented the Grand Jury with no information regarding where Martinez, his wife, and the two children were located inside the Premises, or what they were doing, when the officers entered to execute the search warrant. See GJ, 9/25/19, pp. 50 — 54.
[14] The Commonwealth presented a CD to the Grand Jury containing photographs of the Premises taken by officers when they executed the search warrant. See GJ, 9/25/19, Exhibit 23. The officers apparently placed placards with a different capital letter on them inside each room to identify the rooms. Officers recovered the drugs in the room identified with a placard displaying the letter "E." Thus, the Court will refer herein to the subject bedroom as "Bedroom E."
                                                            Page 11 of 21
chair's wooden frame, below the seat cushion. The hide was not visible or noticeable from the exterior of the sofa chair. Inside the hide, officers found several zip-lock plastic baggies containing the drugs that are the subject of the trafficking indictments pending against Martinez.
            The photographs of Bedroom E depict it cluttered with personal, food, household, and electronic items. It apparently was being used as a storage area. More specifically, Bedroom E contained, inter alia, a bed on top of which piles of clothing and personal items lay; two large stereo speakers and a large flat screen television on the floor in the middle of the room; exercise equipment (i.e., a recumbent bicycle machine and a treadmill);[15] multiple boxes (including a box containing items of food and clothing); and, a suitcase.
THE INDICTMENTS 
            As stated, the Grand Jury returned four indictments against Martinez regarding his alleged involvement in the DTO. He is charged in those indictments with: trafficking in ten grams or more of fentanyl, in violation of G.L. c. 94C, § 32E(c1/2) (Indictment No. 001); trafficking in 200 grams or more of cocaine, in violation of G.L. c. 94C, § 32E(b)(4) (Indictment No. 002); trafficking in 36 grams or more of heroin, in violation of G.L. c. 94C, § 32E(c)(2) (Indictment No. 003); and, conspiracy to violate the Controlled Substances Act in violation of G.L. c. 94C, § 40 (Indictment No. 004).
---------------------------
[15] At the hearing, Martinez described the exercise equipment as being "dusty." The photographs of the items do not support this conclusion, but it is not material to the Court's decision.
                                                            Page 12 of 21
            The drugs seized by police on June 19, 2019, inside the sofa chair at the Premises are the subject of the three drug trafficking indictments pending against Martinez.
DISCUSSION
            In the Motion, Martinez argues that the drug trafficking indictments (Indictments Nos. 001, 002, and 003) must be dismissed because the Commonwealth failed to present sufficient evidence to the Grand Jury that he constructively possessed the contraband seized in the Premises that is the basis of those indictments. With respect to the conspiracy indictment (Indictment No. 004), he argues that the Commonwealth failed to present sufficient evidence to the Grand Jury that he conspired with anyone associated with the DTO to sell or possess drugs.
I. THE LEGAL FRAMEWORK 
            "Under art. 12 of the Massachusetts Declaration of Rights and G.L. c. 263, § 4, a defendant may not be indicted for a felony unless a grand jury, based on sufficient evidence, find probable cause to believe that the defendant committed the crime charged." Commonwealth v. Walczak, 463 Mass. 808, 837 (2012) (Gants, J., concurring). "[C]ourts ordinarily do not inquire into the competency or sufficiency of the evidence presented to the grand jury." Commonwealth v. Cheremond, 461 Mass. 397, 404 (2012) (citing Commonwealth v. Moran, 453 Mass. 880, 883 - 884 (2009)); see also Walczak, 463 Mass. at 816 (2012) (Lenk, J., concurring) (same) (citations omitted). However, as an exception to that rule, a court may consider whether the grand jury received "'sufficient evidence to establish the identity of the accused and probable cause to arrest him' for the crime charged." Walczak, 463 Mass. at 816 (Lenk, J.,
                                                            Page 13 of 21
concurring) (quoting Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982) (internal quotations omitted)). Moreover, a court may "dismiss an indictment where the Grand Jury receive[d] 'no evidence of criminality' on the part of the accused." Commonwealth  v. Gonzalez, 462 Mass. 459, 463 (2012) (citation omitted).
            Said differently, in reviewing the sufficiency of the evidence presented to a grand jury, a reviewing court should "consider only whether the information before the grand jury was adequate to establish [the defendant's] identity and probable cause to arrest him for the crime charged." Commonwealth v. Catalina, 407 Mass. 779, 790 (1990) (citations omitted). "Probable cause requires facts sufficient to warrant a person of reasonable caution in believing that an offense has been committed." Id.
            Finally, the Court is mindful that, "[n]ot only is the standard for indictment low, but when reviewing the sufficiency of an indictment, the grand jury evidence must be viewed in the light most favorable to the Commonwealth." Commonwealth v.  Fernandes, 483 Mass. 1, 21 (2019) (Cypher, J., concurring in part) (citing Commonwealth v. Barbosa, 477 Mass. 658, 675 (2017)).
II. THE COMMONWEALTH FAILED TO PRESENT SUFFICIENT  EVIDENCE TO THE GRAND JURY TO ISSUE THE INDICTMENTS  AGAINST THE DEFENDANT 
A. With Respect To The Drug Trafficking Indictments, The  Commonwealth Failed To Present Sufficient Evidence To The  Grand Jury That The Defendant Constructively Possessed The  Contraband At Issue 
            It is axiomatic that "Rio sustain a conviction of trafficking in [controlled substances], the Commonwealth must show that the defendant had possession of the [drugs]." Commonwealth v. Hernandez, 439 Mass. 688, 691 (2003) (citations omitted). Likewise, for firearm offenses, the Commonwealth must prove possession by the
                                                            Page 14 of 21
defendant. Commonwealth v. Williams, 422 Mass. 111, 120 (1996). Possession may be actual or constructive. Commonwealth v. Romero, 464 Mass. 648, 652 (2013).
            Here, although Martinez was present inside the Premises when investigators seized the drugs at issue in the indictments, he did not have actual possession of the drugs. Thus, the Court must address whether the evidence before the Grand Jury was sufficient to establish his constructive possession of the drugs that are the subject of the challenged indictments.
            "Proof of constructive possession requires the Commonwealth to show 'knowledge coupled with the ability and intention to exercise dominion and control.'" Romero, 464 Mass. at 653 (2013) (quoting Commonwealth v. Brzezinski, 405 Mass. 401, 409 (1989), quoting Commonwealth v. Rosa, 17 Mass. App. Ct. 495, 498 (1984)). "Proof of possession of [contraband] may be established by circumstantial evidence, and the inferences that can be drawn therefrom." Romero, 464 Mass. at 653 (2013) (quoting Brzezinski, 405 Mass. at 409). "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." Commonwealth v. Arias, 29 Mass. App. Ct. 613, 618 (1990). However, "[w]hile presence in an area where contraband is found 'alone cannot show the requisite knowledge, power, or intention to exercise control over the [contraband], . .. presence, supplemented by other incriminating evidence, will serve to tip the scale in favor of sufficiency." Brzezinski, 405 Mass. at 409 (quoting Commonwealth v. Albano, 373 Mass. 132, 134 (1977)) (citation and internal quotation marks omitted).
                                                            Page 15 of 21
            Martinez concedes that the Commonwealth sufficiently established before the Grand Jury that he and his family resided in the Premises and they occupied bedrooms therein. However, he argues that the Commonwealth presented insufficient evidence linking him (and his family) to Bedroom E and the drugs (i.e., insufficient evidence that he knew of, and had the ability and intent to, control the drugs).
            Our appellate courts have regularly held that "[a] defendant's 'residential status at a premises is a relevant inculpatory factor to be considered . . . , since it indicates 'more than mere presence." Commonwealth v. Charlton, 81 Mass. App. Ct. 294, 302 - 303 (2012) (citations omitted); see also Commonwealth v. Clarke, 44 Mass. App. Ct. 502, 505 (1998) (same). However, "[t]hat a defendant provides as his address the place where contraband is found does not alone provide an ability and intent to control the contraband." Id. at 300 (citing Commonwealth v. Boria, 440 Mass. 416, 421 (2003) (notwithstanding that defendant was linked to apartment by her welfare application and her statement that she lived there, "what the Commonwealth showed was only the defendant's presence where contraband was found, at most, allowing the reasonable inference of awareness"). Rather, as previously stated, "'other incriminating evidence" is necessary to "'tip the scale in favor of sufficiency." Brzezinski, 405 Mass. at 410 (citations omitted).
            The Commonwealth must establish "[a] 'particular link' of the defendant to the contraband, or at least to the area where [officers found the contraband]." Commonwealth v. Hamilton, 83 Mass. App. Ct. 406, 411 (2013) (citation omitted); see e.g., Commonwealth v. Alcantara, 53 Mass. App. Ct. 591, 596 (2002) (evidence of defendant's constructive possession of drugs "found under the bathroom sink's kick
                                                            Page 16 of 21
plate" was sufficient where defendant's papers were found in the master bedroom and a prescription pill bottle containing crack cocaine with defendant's name on it was found in the bathroom); Commonwealth v. Rarick, 23 Mass. App. Ct. 912, 913 (1986) (defendant lived in apartment in which drugs and paraphernalia were found in dresser with defendant's personal papers); Clarke, 44 Mass. App. Ct. at 505 - 506 (defendant's clothes and documents found in rear bedroom with contraband in plain view; however, he had no constructive possession of contraband found in another bedroom). "Where contraband is found in a home or apartment, this may be accomplished in one of two ways: by linking the defendant to the contraband via 'other incriminating evidence,' .. . , or by linking the defendant to the particular area of the dwelling in which the contraband was found." Commonwealth v. Proia, 92 Mass. App. Ct. 824, 831 (2018) (internal and external citations omitted).
            With this legal framework in mind, and viewing the evidence presented to the Grand Jury in the light most favorable to the Commonwealth, the Court concludes that the evidence before the Grand Jury is insufficient to establish probable cause to believe Martinez knew of, and had the ability and intention to exercise dominion and control over, the drugs (i.e., constructively possessed the drugs) that are the subject of the trafficking indictments.
            As stated, the Grand Jury was not told where in the Premises Martinez was located or what he was doing when the officers entered to execute the search warrant. Thus, his proximity to the drugs was unknown to the Grand Jury. Likewise, Bedroom E did not contain any particular evidence that "linked" Martinez to it, such as personal documents with his name, or that of his wife or children, on it. See e.g., Commonwealth 
                                                            Page 17 of 21
v. Cruz, 34 Mass. App. Ct. 619, 621 - 623 (1993) (although defendant admitted living in apartment, no evidence "tied" defendant to bedroom where drugs found and compelling evidence linked another man to that bedroom; fact that defendant ran from window when police approached and was running from living room to kitchen proved neither flight nor effort to protect contraband); Commonwealth v. Booker, 31 Mass. App. Ct. 435, 438 (1991) (insufficient evidence of possession where drugs found in living room of apartment that defendant shared with at least one other person); Rarick, 23 Mass. App. Ct. at 913 (sufficient evidence defendant possessed drugs in bedroom where her personal effects were found in proximity to drugs, despite evidence she shared house with one or more individuals). Further, there was no evidence of drug distribution activity in plain view in the Premises, such as packaging materials and cutting agents, and there was no evidence Martinez displayed consciousness of guilt to the officers that executed the warrant. See Boria, 440 Mass. at 420 (citation omitted).
            For its part, the Commonwealth points to the evidence before the Grand Jury of Martinez's activities in moving items from DTO stash locations at the direction of the DTO leader, RCG, and Martinez's communications with, and transportation of, Santiago Ortiz, the DTO's second-in-command, in the days preceding the execution of the search warrant. To be sure, the Grand Jury was told that, only two days before the search, Martinez and Santiago Ortiz moved the sofa chair into the Premises in which the drugs were ultimately found, and that RCG told Santiago Ortiz to drive around before arriving with the sofa chair at the Premises.[16] In fact, the Court must assume that Martinez did, in fact, drive around after loading the sofa chair into his vehicle and before arriving at
---------------------------
[16] In fact, officers observed the two other items officers saw Martinez and Santiago Ortiz move into the Premises with the sofa chair (i.e., the speakers and television) in Bedroom E.
                                                            Page 18 of 21
the Premises given that the Court must view the evidence presented to the Grand Jury in the light most favorable to the Commonwealth. Moreover, although the drugs were hidden inside a "hide," one could argue that Martinez may have known about the hide and drugs when moving the sofa chair because of the weight those items likely added to the sofa chair.[17] These facts certainly make the decision regarding the sufficiency of the evidence of constructive possession a close one. However, these facts do not "'tip the scale in favor of sufficiency.'" Brzezinski, 405 Mass. at 409 (citation omitted).
            The Commonwealth did not present to the Grand Jury evidence that Martinez was involved in any drug distribution activities (or even mentioned by others to have been involved) or that the Premises was used by the DTO or for drug distribution activities. Hence, although as stated it is a close call, the mere moving of the sofa chair, etc., by Martinez at RCG's request into premises he shared with RCG does not establish probable cause to believe Martinez had "'knowledge [of the drugs] coupled with the ability and intention to exercise dominion and control." Romero, 464 Mass. at 653 (citations omitted). Furthermore, although "possession may be joint, and the Commonwealth need not exclude the possibility that others may also be in possession of the contraband," the fact that the DTO's leader, RCG, was present in the Premises and lived there "ma[kes] it unreasonable to impute possession to th[is] defendant[]." Hamilton, 83 Mass. App. Ct. at 413 n.8 (citations omitted).
            Therefore, the Commonwealth failed to establish at the Grand Jury probable cause to believe Martinez constructively possessed the drugs that are the subject of
---------------------------
[17] The drugs recovered inside the hide weighed approximately 3.5 kilograms, or approximately 7.5 lbs., and the hide itself appears to have been constructed with metal.
                                                            Page 19 of 21
Indictment Nos. 001, 002, and 003, and the Motion must be ALLOWED as to those indictments.
B. The Commonwealth Failed To Present Sufficient Evidence To  The Grand Jury That The Defendant Conspired To Violate The  Controlled Substances Act 
            Martinez also argues that the Commonwealth failed to present sufficient evidence to the Grand Jury to support the indictment charging him with conspiracy to violate the Controlled Substances Act in violation of G.L. c. 94C, § 40 (Indictment No. 004). The Court agrees.
            As the SJC has stated:
The elements of conspiracy are "a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose." . . . . To prove a conspiracy, the Commonwealth "must prove that the defendant combined with another with the intention" to "commit the object crime  "         Proof of an overt act in furtherance of the conspiracy is not necessary. . . . [A] conspiracy may, and typically is, proved by circumstantial evidence, because often there is no direct evidence that an "agreement" was reached.
Commonwealth v. Nee, 458 Mass. 174, 180 — 181 (2010) (internal citations and quotations omitted). Simply put, "[t]o sustain a conviction for conspiring to distribute [drugs], the prosecution must have introduced evidence tending to show that [the defendant] made an agreement with another person to distribute [drugs]." Commonwealth v. Stoico, 45 Mass. App. Ct. 559, 562 (1998) (citations omitted).
            Here, as shown above, the Commonwealth failed to present any evidence to the Grand Jury that Martinez agreed with anyone to sell or possess drugs. Therefore, so much of the Motion that seeks the dismissal of the conspiracy indictment (Indictment No. 004) is ALLOWED.
                                                            Page 20 of 21
ORDER
For the above reasons, it is HEREBY ORDERED that:
            1. Defendant's Motion To Dismiss (Paper No. 17) is ALLOWED. Indictments Nos. 001 through 004 are HEREBY DISMISSED.
            2. This Order is HEREBY STAYED for a period of thirty (30) days.
@/s/Jeffrey T. Karp Associate Justice, Superior Court
@August 21, 2020
                                                            Page 21 of 21